Chattanooga, Rome & Columbus Railroad Co. *v.* Lyon.

1. Under the evidence the damages found by the jury were grossly excessive, and for this reason a new trial should have been granted.
2. It being uncertain whether testimony offered related to the particular transaction under investigation, or to another, it was not error to admit the testimony under instructions to the jury to the effect that it was for them to determine whether it did or did not relate to the transaction in issue, and if it did, they could give it such weight as they saw proper. It would have been better, however, to add that if it did not relate to this transaction, they should disregard it entirely.
3. When a railroad company sells a ticket to a flag station, at which its trains do not stop unless signalled to do so for the purpose of receiving passengers, or when there are on board passengers bound for such station, it is, ordinarily, the duty of the conductor, before reaching the station, to ascertain from a passenger holding such ticket his destination, and to stop the train there for the purpose of allowing the passenger to leave the train. This rule, under special circumstances, is subject to exceptions.

March 23, 1892. Argued at the last term.

Railroads. Passengers. Damages. Evidence. Before Judge Maddox. Floyd superior court. September term, 1890.

Reported in the decision.

W. W. Brookes and W. T. Turnbull, for plaintiff in error.

Wright & Meyerhardt, *contra.*

Lumpkin, Justice.

1. The testimony of the plaintiff, formerly Miss Fincher, now Mrs. Lyon, was substantially as follows: On April 6, 1889, she walked a half mile to Holders station, on the C. R. & C. railroad, part of the way being through the woods, and bought a ticket to Brookes station, about six miles distant. The ticket was exhibited to the jury. She took the train about half-past one o'clock in the afternoon, the conductor assisting her to get on. He did not ask her destination,

nor did she tell him, but after helping her on the train, he went on through the car, and no one came to take up her ticket. She was not accustomed to traveling on railroads. The train passed Brookes without stopping, and she did not know when it passed, but would have known that station had she been looking. The train stopped at Lake Creek, a mile and a half beyond Brookes. She then went to the door, and while standing in the door, and the conductor was out on the steps, he told her in a loud tone of voice, and in the presence of other people, to get off. She replied she did not want to get off there, and he said she must do so. She told him she was alone and did not know the road, and he said it was only a mile and a half up the railroad to Brookes. He did not take hold of her, but when he told her to get off, she just got off and went on back to Brookes as he told her, up the railroad, walking. Some of the way was through the woods. She did not see any young lady at the station where she got off, and no lady offered to walk with her up the railroad. Plaintiff was going to see her sister who resided a quarter of a mile from Brookes, and intended to walk from the station to her sister's house. She lived in the country, and was in the habit of walking a good deal; was in the habit of walking as far as a mile and a half; would not have considered that much of a walk if she had known the way and had not been alone. The day was pleasant, and she found her way back to the station easily, and reached her sister's in safety. No one met her at the station, nor did she expect to be met there, as they did not know at her sister's she was coming. The conductor did not say anything about her stopping at Lake Creek and waiting for the next train, nor did he offer to take her to Cedartown and send her back on it, nor did she ask to be taken to Cedartown.

Two witnesses for the plaintiff (Smith and Wright)

testified to an occasion when they saw a conductor on this railroad treat a young lady rudely. One of them fixed the time of its occurrence as being in March or April, and the other in March. The former did not see the conductor take her by the arm; the latter did. Both stated his language and manner were discourteous, but neither positively identified the young lady of that occasion as the plaintiff in this case. One said he saw a resemblance in the plaintiff to the young lady he saw put off the train, and added that his main reason for thinking the lady he saw on the train was the plaintiff was, that on reaching Cedartown he met a gentleman, not a resident of Cedartown, to whom he told the incident on the train, and this gentleman said he supposed it was a lady he was expecting at his house that day. The witnesses located the conversation between the lady and the conductor as beginning with both parties inside the car.

It is not at all certain, but on the contrary exceedingly doubtful, that the occasion referred to by these witnesses is the same as that to which the plaintiff testifies, especially so because she herself does not make the conduct of the conductor by any means so reprehensible as they do, nor does her testimony coincide with theirs as to where the conversation with the conductor began. The strong probability is, that what they saw and heard was at some other time and involving some other lady. The gentleman at Cedartown who said a lady was expected at his house the day the witness told him of the incident on the train could not probably have referred to plaintiff, because she states the visit she was making that day was unexpected.

The material parts of the testimony of the conductor were to the following effect: Brookes is a flag station at which trains do not stop except to put off or take on passengers. When plaintiff got on the train, he under-

stood from friends who accompanied her to the train that she was going to Brewer's, a station below Lake Creek, and for this reason and the fact that he had no other passenger to get off before reaching Lake Creek, he did not call for her ticket before reaching Brookes. After discovering that she had passed her station, he politely offered to put her in charge of a lady agent of the company at Lake Creek until the next train going towards Brookes came along, or take her on to Cedartown, where he met that train, and send her back on it; or if she preferred, she could walk back to Brookes. She said she did not know the way back, and he told her to keep down the railroad, and the lady agent offered to show her the way or go back with her. She then voluntarily left the train. His treatment of the young lady was gentle and kind, and the tone of his voice perfectly mild. The porter on the train corroborated the conductor's statement.

In view of the foregoing summary of the testimony, there can be no better way of dealing with the merits of this case than to treat it as if the testimony of the plaintiff presented the exact truth of what occurred. The jury certainly did not accept the conductor's version of the matter, and we have no authority to say they erred in this respect. They may have been influenced to some extent by the testimony of Smith and Wright, but we cannot be sure of this. Again, it is very doubtful, as has been seen, whether their testimony relates to the real transaction under investigation, and even if it does, it is more than probable that the plaintiff herself gives the most accurate and reliable account of it. There can certainly be no want of fairness or justice to this lady in accepting her statements as absolutely true. Thus viewed, can the verdict for $2,000.00 be sustained? We think not. According to her own account, the inconvenience she actually sustained was not at all serious.

It seems that it was her habit to walk a great deal, and she says that a walk of a mile and a half on a pleasant day in April was not "much of a walk." The fact that a part of her walk along the railroad was "through the woods" is offset by the fact that a part of her walk to the station where she took the train was also "through the woods." Her difficulty in finding the way was inconsiderable; she had only to follow the railroad track, and she admits she did so easily. It does not appear that she was exposed to any real danger or harm, and there was but little occasion for alarm. So far as the facts just recited are concerned, it seems to us that no unbiased mind could reach the conclusion that for alleged injuries of this kind, $2,000.00 would not be utterly unreasonable and extravagant. Does the behavior of the conductor, in connection with the other facts, justify any such finding? We feel constrained to say it does not. It was probably his duty, under the circumstances, to do exactly what he swears he did. But discarding his testimony and accepting that of the plaintiff, he told her in a loud tone of voice she must get off the train. He used no insulting language; he did not touch her or otherwise offer her personal violence, nor did he in any way restrain or control her movements other than by the request, or command, addressed to her loudly. The element of *loudness*, though not even alleged in the declaration, constitutes the chief impropriety of his remarks; and while we do not, of course, approve of this manner of speaking to a lady, we do not think the vindictive damages included in this large verdict are warranted by the facts as stated. This court, we trust, is not wanting in respect and devotion to the fair women of Georgia. We regard them as incomparably the best and most admirable portion of our population, and will never be disposed to deny them the fullest protection in the enjoyment of all their rights which the law, properly

administered, can give. At the same time, we are un-willing to subject ourselves to such a criticism as was made by that great judge, Hon. IVERSON L. HARRIS, upon his distinguished brethren, in *Clements* v. *Bostwick*, 38 *Ga.* 1; in which he thought they had *stretched* a principle very far in sustaining a widow's right to dower. Speaking of their judgment, he said it could be justified only on the ground on which Steele defended Dryden, who had compared the Duchess of Cleveland to Cato, the wit vindicating the poet by saying, "there was no stretching a metaphor too far when a lady was in the case." We fear that courts and juries are becoming too apt *to stretch damages* too far when they are to be awarded to one of the gentler sex. Judge HARRIS concludes his dissenting opinion by saying: "For many years I have witnessed with uneasiness the quixotism which the bench displays whenever a woman is a party, or a woman's claims are involved. I fear that it is an *incurable insanity*, as thus far it has exhibited no obedience to law, and is deaf to reason, and *even insensible to ridicule*."

The danger was not, and is not, so serious as this language would imply, but there is undoubtedly good reason for the courts to guard against the natural ten-dency to unduly favor women as litigants. Striving earnestly to look at the case before us carefully and im-partially, we cannot avoid the conviction that it affords an instance of this kind, and that the ends of justice require another trial. It is needless to cite the numerous cases in which verdicts for large amounts have been rendered in cases more or less similar to the present one, or to point out the instances in which they have been allowed to stand, or have been set aside. As each case must at last depend on its own peculiar facts and cir-cumstances and be tested with reference to the same, precedents of the kind referred to are of no great value.

2. It being doubtful, as already shown, whether or

not the testimony of the witnesses Smith and Wright related to the transaction really in issue, it was the province of the jury, and not of the judge, to determine this question. The court, therefore, rightly admitted the testimony and gave the proper instructions concerning it, except that he might have made the addition suggested. Without this addition, it can scarcely be doubted that the jury understood they were to disregard this testimony if in their opinion it related to another and entirely different occasion.

3. Complaint is made of the following charge of the court: "If the plaintiff purchased a ticket at Holders station to go to Brookes station, and got aboard of the train, if they failed to stop the train—if the conductor failed to come into the car or stop the car according to contract at Brookes station, she would be entitled to nominal damages, if that was brought about by no fault on her part." It is urged that this was error because Brookes was a flag station, and she should have given notice to the conductor, especially when the evidence showed it was only a few minutes run; and it was error further, because there was no evidence of a contract to stop at Brookes.

The plaintiff sued for an alleged tort, and not for breach of contract. The theory of the action is, that the defendant contracted to carry her to Brookes and land her there, and that its violation of this contract was a breach of its duty as a common carrier, constituting a tort for which she can recover, and in connection therewith, also for the alleged wrongful and tortious conduct of the conductor in ejecting her from the train after passing her station. The above quoted charge was doubtless given upon the idea that the sale of the ticket to Brookes station was an *absolute* contract by the defendant to stop the train there, with or without notice to do so from the passenger, and that a fail-

ure to stop would, consequently, be a breach of duty amounting, as stated, to a tort for which the plaintiff, whether actually damaged or not, could recover at least nominal damages. In view of the nature of the action as above stated, and of the evidence submitted, the charge was correct if the sale of the ticket to Brookes station necessarily involved an absolute and unconditional undertaking by the defendant to stop the train there. If, however, the contract was not thus absolute, and it was the duty of the passenger to notify the conductor of her desire to stop at this station, the mere failure to stop would not entitle her to even nominal damages. As a general rule, we think the sale of a ticket to a particular station, to be used on a given train, imports an undertaking on the part of the company not only to take the passenger to that station, but to stop there and allow him reasonable time and opportunity to alight. Leaving out of consideration, for the present, the question whether or not there may be instances when this rule should not operate, it would seem, in the absence of some special reason for requiring a passenger to notify the conductor of his destination before being called upon to exhibit his ticket, that so doing would be engrafting upon the contract a condition outside of its terms and not usually contemplated by the purchaser. The holder of the ticket has, ordinarily, the right to assume, when he buys it, that the company will safely land him at his destination. Accordingly, he has the right to presume the conductor will call for his ticket before reaching the station specified, and thus obtain notice of the fact that he desires to stop at such station. Of course, when the conductor takes up and examines the ticket, the information will be thus conveyed to him that he has a passenger for this station, and there will be no difficulty at all in his carrying out the contract which has been made between the company and the

passenger. When a railroad company sells tickets to a station of this kind, it unquestionably does so for the purpose of obtaining the money of its customers, and all of its employees certainly ought to know that upon every passenger-train there are likely to be one or more passengers for such stations. Beyond doubt the agent who sells the ticket is aware of the fact that there will be on the train for which the ticket is sold a passenger of this kind, and in most cases the conductor will be able to ascertain the fact by prompt and proper attention to his duties. Every company should so conduct its passenger business as to adequately serve all of its customers, and if any company, without sufficient excuse, fails to do this, the omission amounts to negligence, and it will be responsible for the consequences. The general rule, therefore, as to the duties of railroad companies toward passengers holding tickets for flag stations should be as we have stated; but as already intimated, we do not think this rule should be inflexible. There may be circumstances under which a passenger for a flag station is carried beyond his destination when it would not be fair or just to attribute the fact to the company's negligence.

In a recent Texas case, Gulf C & S. F. Ry. Co. v. Ryan, 18 S. W. Rep. 866, it appeared that defendant in error bought a ticket to a flag station, knowing it was such, and that trains did not stop there "unless some request was made upon the conductor to do so." It would seem that he bought the ticket subject to the condition that he must notify the conductor of his destination, and failing to do so, it was held he was not entitled to recover. Aside from instances like this, there may be other occasions, which we will not attempt now to specify or enumerate, when the conductor will be prevented, without fault on his part, from ascertaining in time the desire of a passenger to stop at a flag station,

or when, under the circumstances, it is manifestly the duty of the passenger to see to it that the conductor has the necessary information. In cases of doubt as to which should take the initiative, the question may very properly be left to the jury. This was done in the present case, in that portion of the charge relating to the alleged tortious conduct of the conductor in ejecting the lady from the train. The court said: "It is charged that it was negligence in the conductor in failing to go back and inquire, and that that brought up this trouble. It is for you to say what is negligence in this case — whether it was negligence for him to fail to go back in that train, and to pass that station without going back to inquire. I charge you that it is the duty of a railroad company to take extraordinary care of its passengers. It is for you to say whether or not he discharged his duty—whether or not it was his duty to go back and inquire where the young lady wanted to go." Under the circumstances of this case, this charge was quite as liberal to the company as it had any right to expect. The jury found that the duty of notifying the conductor of her destination was not primarily imposed upon the plaintiff, and assuming this finding to be correct, it follows that there was a breach of duty on the part of the company entitling her to a recovery, in which additional damages to a reasonable amount for her wrongful ejection from the train could very properly be included.

4. In none of the remaining grounds of the motion for a new trial does it appear that any error was committed by the court below, requiring the grant of a new trial. The judgment is reversed solely for the reason stated in the first head-note.　　　*Judgment reversed.*