THE GEORGIA RAILROAD AND BANKING COMPANY *v.* JETT.

1. The evidence making no case for a recovery by the plaintiff of actual damages on account of loss of time or for expenses incurred, and her right to recover being entirely for injuries to her peace, happiness or feelings, a charge that "*in all cases* where a tort has been committed, the damages are left to the enlightened conscience

of an impartial jury," though not strictly correct, was harmless to the defendant.

2. There was no error, after instructing the jury, in substance, that the only measure of damages which are incapable of being estimated in money was, the enlightened conscience of impartial jurors, in repeating a similar instruction as to the measure of damages while charging upon the law as to vindictive or punitory damages.

3. The verdict in this case being out of all reasonable and conscientious proportion to the injury, and so large in amount as to give reason to suspect bias or prejudice on the part of the jury, the ends of justice require a new trial.

December 21, 1894.

Action for damages.    Before Judge CLARK.    DeKalb superior court.    February term, 1894.

On October 28, 1891, the plaintiff, a girl of fifteen years, was a passenger on defendant's accommodation-train from Atlanta to Jett's station, a flag-station about twelve miles from Atlanta, and about a mile beyond Clarkston. The train left Atlanta at 6.15 P.M., and reached Jett's station at or shortly after seven o'clock, after nightfall. Plaintiff testified: I told the the conductor I desired to get off at Jett's station. After leaving Clarkston the train stopped at Windom. I got up and went out on the platform, as I knew there was no stopping-place between Clarkston and my station. The conductor motioned to me and said, "Go back; I will let you know when you are to get off," speaking very roughly. That, I suppose, was about a quarter of a mile from Jett's station. The reason that I went on the platform was, that I thought that was my destination. The train made no stop at Jett's. After it had passed, Mr. McClelland told the conductor he had passed my station. The conductor said he could not help it; he could not stop the train, and that I would have to go on to Stone Mountain. That occurred about a half-mile, I suppose, the other side of Jett's station. I got off the train at Stone Mountain. The conductor

said he would carry me back all right the next morning. I spent the night at Mr. McClelland's. The next morning when the train stopped, Miss Maddox, a friend that I had met at the depot, and myself (Mrs. McClelland, was going on the same train to Decatur, but was not with me at the time), attempted to get on a passenger-car. As I started to get on, the conductor came and asked me if I was the lady he had carried by her station last night. I told him, yes; and he said, come down this way, towards the baggage-car. I told him there were too many colored people there. He said, "That don't make any difference; you can get on; come on, and I will show you how to get on." I went with him. He took me to the baggage-car. I had to sit on a trunk in the baggage-car. Besides myself and the baggage-master, there were a colored man and one or two others whom I did not know, in the baggage-car. The colored man stayed there a while. I don't know whether he was taken out or not. I preferred to ride in the passenger-car. I went into the baggage-car because the conductor told me to; he spoke so roughly, and I thought he knew better than I did how the train was crowded; and I did not think he was going to carry me to the baggage-car when I went. It mortified me very much to have to be separated from my friends and carried to the baggage-car, and for him to speak as roughly as he did.

From the testimony of the conductor, the baggage-master and McClelland, the following appears: The time was while an exposition was being held in Atlanta, and the train was much crowded. It had six cars, two more than the usual number. The first time the conductor tried to ring the engineer down he failed to do so; the next time he stopped, but it was found to be the wrong place. It was such a dark night that the conductor could not see well, and the next time they could not

stop until they had passed Jett's station.  They were passing Jett's house when the conductor rang down the engineer the second time. The train went about a quarter of a mile beyond the station, and McClelland, at plaintiff's instance, spoke to the conductor about having passed it.  Finally the train stopped about a half-mile or more beyond Jett's station.  Considerable discussion and some excitement ensued.  With a view to helping out of the difficulty, McClelland procured a young man known to him, who agreed to escort plaintiff from there back to her home; but she declined to go with him.  Thereupon Mrs. McClelland volunteered to take care of plaintiff until the next morning, the conductor agreeing to take her back home then.  She was a stranger to the McClellands, but they took her to their home, treated her kindly and showed her every courtesy. The conductor would not run the train back to Jett's after it stopped, because he thought it dangerous to do so; there being a freight-train following, which left Atlanta twenty-five minutes after this train left, the latter having frequent stops to make and the freight-train none. On the next morning the conductor carried plaintiff to the baggage-car because he thought it would be more convenient for her to be there, as the baggage-master could assist her off when the train had run the three miles from Stone Mountain to her home; the train being very much crowded.  He considered it a courtesy to take her to the baggage-car where she could have a seat.  He denied that he mistreated plaintiff in any way, or having had feeling against Jett and his family for some years. When plaintiff entered the baggage-car, the baggage-master asked the negro who was there to go into the smoking-car, which he did, leaving no one in the baggage-car but plaintiff and the baggage-master, who turned a trunk down sidewise and asked her to have a seat upon it.  When the train reached her station, the

conductor being busy, the baggage-master stopped the train and saw her off at the crossing. During the exposition ladies often rode on the baggage-car, the train being crowded, and they being glad to get seats there. They would stand on the platform and hold to the banisters.

Plaintiff's father testified: The freight-train usually passed my station fifty-five minutes after the accommodation-train passed. It is up grade from Clarkston towards Stone Mountain. Often freight-trains stalled there, and had to go back west of Clarkston to get a start. On the night in question I was standing on my veranda and heard the accommodation-train stop three or four hundred yards before reaching Jett's station. When it passed my house it was working steam, and was traveling, I should judge, not under twenty miles an hour. This conductor and I had a dispute, nearly five years previously, about a matter connected with the road. I and the members of my family, including the plaintiff, have frequently ridden on the train since. On one occasion when I helped my wife on this train (she having a baby in her arms and leading a four year old child), as soon as she got upon the platform this same conductor waved his hand to the engineer and the train started before she got inside the car, and threw her against the banisters. Twice before he had carried me about 350 yards beyond the crossing. Once when the train did not stop at the crossing, I went through two coaches to find him, and failing to do so, rang the bell myself and stopped the train. He then came and told me I had no right to pull the bell-line; to which I replied that he ought to have stopped for me and had not done it. I also spoke to him a time or two about stopping before reaching the platform and with the coaches back in a cut, etc.

JOSEPH B. & BRYAN CUMMING and CANDLER & THOMSON, for plaintiff in error.

SMITH & PENDLETON and JOHN S. CANDLER, *contra.*

LUMPKIN, Justice.

The plaintiff, Miss Callie Jett, brought an action against the Georgia Railroad and Banking Company for two alleged torts. One was, carrying her past the station to which she had paid her fare; and the other was, compelling her to ride in the baggage-car on the following morning when she was returning to her home. We have directed the reporter to state the material facts developed by the evidence. The defendant admitted liability as to the first of the above mentioned matters, and as to this ground of complaint the only question at issue was, what should properly be the amount of the recovery. As to the second ground of complaint, the defendant denied liability, insisting that inviting the young lady to ride in the baggage-car for the short distance she had to go was but an act of courtesy and kindness intended to relieve her of the inconvenience of riding in a passenger-car which was very greatly overcrowded, and in which she could not have found a seat. The legal questions involved in the case are free from difficulty.

1. The plaintiff's evidence made no case at all for the recovery of any actual damages sustained by reason of loss of time or of expenses incurred. Her right to recover, under the proof submitted, was entirely for injury to her peace, happiness or feelings. Therefore, in this case, the damages were to be arrived at solely by reference to the enlightened consciences of impartial jurors. The judge charged as indicated in the first headnote. It is obvious at a glance that this charge, as an abstract proposition, is not strictly correct; for there are certain kinds of damages in most cases of tort which are capable of being accurately estimated in money. Nevertheless, in its application to the facts of the present case, we do not think this charge could have resulted in any harm to the defendant.

v 95-16

2. The plaintiff sought to recover damages, not only for injury to her peace, happiness and feelings, but also vindictive or punitory damages, because, as she insisted, there were aggravating circumstances attending the infliction of the wrongs upon her. The court charged as to both these kinds of damages, and in each instance instructed the jury that the only measure of damages was the enlightened consciences of impartial jurors. There was no error in this, for the rule stated was the correct one for ascertaining the amount to be awarded in both kinds of the damages referred to, and there was no impropriety in repeating it in connection with the instructions given the jury as to the second kind, although the court had previously stated this rule in charging the jury as to the first kind.

3. We grant a new trial in this case, because we think the verdict was too large and out of all just and reasonable proportion to the injury done to the plaintiff. We cannot help feeling that the amount is so great as to give reason to suspect bias or prejudice on the part of the jury. An examination of the evidence will show that no physical pain was inflicted upon the plaintiff, no indignity offered her, and that she endured no mental suffering or anxiety. The actual inconvenience to which she was subjected was very slight indeed, and yet the relatively large sum of $750 was awarded to her. The evidence as to the alleged "aggravating circumstances" was, in our opinion, very weak indeed. It seems there had been some slight grudge between the conductor and the father of the young lady; but it is not, in our opinion, in the least degree probable that the former was at all influenced by it. The evidence of the conductor is not entirely clear and satisfactory. It would, perhaps, not be unfair or unjust to say that he evidenced stupidity, both as to his conduct in the transaction under investigation and as to the account of it given by him on the stand. We

do not think, however, this constitutes any good reason for inflicting such a penalty upon the railroad company as the jury have seen proper to impose. It is with great reluctance that we ever interfere with the verdicts of juries on the ground that they are excessive, but this is one of the cases in which we feel constrained to do so. In this connection, see *Georgia R. R. & Banking Co.* v. *Eskew*, 86 *Ga.* 641, where a verdict of the same amount, under circumstances probably more strongly justifying its rendition, was set aside by this court. It was not, it is true, distinctly ruled that the damages were excessive; but Chief Justice BLECKLEY expressed the view of the entire court when he said: "We are strongly inclined to the opinion that the amount is out of reasonable and conscientious proportion with the magnitude of the injury." See, also, *C., R. & C. Railroad Co.* v. *Lyon*, 89 *Ga.* 16, and note specially the language of the opinion on pages 20 and 21. Upon the sole ground that the verdict is excessive, a new trial is ordered.

*Judgment reversed.*